Next case on the calendar is No. 17-2556, Okudinani v. Rose and others. May it please the court, Denny Okudinani heard the words, we don't want you here. We don't want your kind here. Or any little niggers here. Those were the words that were used. This is one of a series of litigations that have been ongoing. The Hogans were ordered to pay $200,000 in punitive damages in one of these earlier cases. Is that correct? No. It was reversed on appeal and reduced, I think, to $20,000 by the Fourth Department. And has it been paid? Yes. Go ahead. The causes of action here that were dismissed in error by the district court include Section 1982, which prohibits private conduct which interferes with the use of property, as well as the ability to ingress and egress. Denny Okudinani and his hosts, the Hogans, were subjected to that conduct. Could you be very specific about the dates on which these incidents that have been alleged occurred? My reading of the complaint suggests that we were talking about a period beginning maybe between 2006, 2009 to maybe 2017. And the allegations were quite unspecific about when the maybe seven different events occurred. Could you give us a chronology? Off the top of my head, I cannot, but I know that there was reference points. For example, there was reference to the July 4th matter. There were arrest records, of course. The years are important because we were talking about a period of at least four years and maybe six different events over the course of that time in which there was some ambiguity about what was said, but even accepting what was said as true, as we have to on review of a motion to dismiss, the described incidents were sparse. And it wasn't clear to me that considered together over the course of four years that they would establish a racially discriminatory motive for interference with enjoyment. I was having difficulty understanding that. So that's why I'm asking you to be specific about when Denny Okudinani heard words and when these events occurred. I'd have to go back and look at the record for the specific date, but I know that it was the summer of 2006 or 7. So it was during that time that he first started coming up to the cottage and then it was thereafter that the kids were attacked by the Kubota with Mr. Hogan and Mr. Rose and Mr. Vandewater. Now there are records, there are criminal records that reference the dates because certainly the police were called. What period are we talking about? I don't know off the top of my head, Your Honor. In 2011, when was the complaint filed? The complaint was filed, I believe in 2011. I believe this one was filed in 2011, Your Honor. But this was a five-year period. This was after Denny had been subjected, and Jack, the two children had been subjected to that. But I think that to call the incident sparse overlooks the seriousness of the incidents because the expression of racial animus and the bias in such a harsh and derogatory fashion, I think in and of itself is sufficient to constitute a Section 1982 violation. If you take a look at it. All you'd need, in your view, is one incident of a racial slur being used while someone was on a piece of property to justify a 1982 action? The Supreme Court in Jones v. Alfred Meyer said, we are not at liberty to seek ingenious analytical instruments to carve from Section 1982 an exception for private conduct, even though its application to such conduct in the present context is without established precedent. So because Section 1982 was founded and originally part of Section 1 of the Civil Rights Act of 1866 and the Thirteenth Amendment emanating from them, and that statute … I don't think it's a Section 1982 violation because, as Judge Carney pointed out and Judge Jacobs in reference to the history of the case, Mr. Hogan in his affirmation goes through a long history of things that appear to have nothing to do with race, trespassing signs and all sorts of other incidents where there's no reference to race, it doesn't involve the children. So we have to put those aside for purposes of Section 1982, right? His reference does refer to race. It was after … Give me other instances where you could say this one clearly was about race, other than the Komoda incident and the Making of Noises incident. What other incidents can you say, look, there's something that indicates this wasn't just a dispute over property, this was an issue of race? Denny heard himself referred to as a fresh air child. They called the police on his sister in the lake because she was … the report was polluting the lake. I saw the reference in his declaration, but how does he know … what's the evidence of that, that they said that to the police? Was there testimony from the police officers? He heard them say that? That was from Mr. Hogan. He heard them say that to the police? The police came and reported that they had gotten a report that he was polluting the lake when the sister of Denny was in the lake. So the police told him … Correct. … that was what was said to them? Correct. Correct. And for purposes of the motion to dismiss and the summary judgment, we have to accept that as true. The significance of what occurred in 2005 was that is when Denny started visiting the lake with the Hogans. That culminated in that expression of direct animus, bias, against him because of his race and because the Supreme Court has said we can't carve out exceptions to this protection. What we're trying to do here is eliminate the bias, the racism … Was there litigation going on between and among any of these parties before Denny started visiting the lake? No. No. No. So Denny started visiting the lake in 2006 or 07? 05. 05? That's my recollection, Your Honor, that it was in 2005. And Mr. Hogan makes that assertion, I believe, in his affidavit … Was there litigation over an easement? Pardon? Was there litigation over an easement? No. Not before 2005. There was subsequent. This is part of this case was that they interfered with his access to his property. And that was the … included the abusive process claim, which we contend was sufficiently pled and had sufficient evidence to avoid summary judgment. And also, the court erred in dismissing the IIED claim. I mean, what the defendants have succeeded to do in some success here is to demonize Mr. Hogan and to lump these children … By demonizing Mr. Hogan, I mean a state court judge imposed punitive damages. That's correct. For what reason? What was the reason for that? The reason was that he took a plaque that was bolted to a rock and returned it to its owner. That was considered desecration. And that state court judge imposed punitive damages of $200,000, which on appeal was reduced to $20,000. That was a jury decision. That was a jury decision that was appealed. It wasn't a judge's decision. But in any event … The deduction was a judge's decision. The $20,000. Correct. Correct. But that's part of the problem here. I mean, that doesn't have anything to do with Denny. It doesn't have anything to do with Jack or Beth. And those plaintiffs in this case were not permitted to have a finder of fact, make a determination as to whether or not they were subjected to this treatment. And then at the trial, of course, Judge Rothstein used a survey that was created … There were controversies and lawsuits between and among these parties that dealt with things that did not have anything to do with Denny. Mr. Hogan was sued by the West. He did not sue them. As a result of that litigation, Mr. Vandewater stipulated to the backlot line, which then they started arresting him for. And this Court can take judicial notice of the habeas corpus petition, which was brought with respect to the speedy trial claim, and denied. And this Court said that he needed to plead guilty in order to assert a speedy trial claim. So I see I'm out of time. This Court said. Did the Court of Appeals say that? Yes. What is the reference? The habeas corpus petition that was brought on the basis of speedy trial. There were 15 claims. There were 15 charges against Mr. Hogan that were pending more than 8 years, 5 to 8 years, that were all eventually dismissed. All of those criminal charges, trespassing charges were dismissed. Okay. Thank you. You have 3 minutes for rebuttal. We'll hear from, I guess, Ms. Campbell first. Good morning, Your Honors. May it please the Court? Stephanie Campbell from Bond, Shen, and King, on behalf of Defendant Appellee Frank Rose.          I'm a lawyer. I'm a lawyer. I'm a lawyer. I'm a lawyer. I'm a lawyer. I'm a lawyer. I'm a lawyer. Mr. Hogan, as Stephanie noted, the allegations supporting plaintiff's Section 1982 claim are indeed sparse. In fact, with respect to Defendant Rose, there really are no claims. There is no allegation that Defendant Rose uttered any racial epithets. Before you get to that issue, the district court decided that based upon legal grounds that Section 1982 does not apply to use and enjoyment of land, and said there was no authority for that, but in the papers, it's clear, the Supreme Court in the city of Memphis v. Green said that it relates to use of property, the Fifth Circuit in Greer, the Sixth Circuit in Brown, and this court, as they cited in their reply in Oldsman, we concluded that a private slim-cum that changes rules to not allow African-American black children who aren't members to be there, that that was also a 1982 violation. So wasn't the district court wrong on that legal issue? I don't believe that the district court was wrong on that legal issue, but under these circumstances, it is a mixed question of law and fact, because in the cases that you've just referred to, the plaintiffs cited in their reply brief, the circumstances were very different. In those cases, the plaintiffs actually were deprived of some sort of right to use and enjoyment of their property. Mr. Hogan, there's a lot of references in the records. I think that, in fact, Mr. Hogan's saying after these instances, they didn't use certain portions of the property because out of fear. So if we have to take his version of the events is true, if, in fact, there was an effort to run over these children, that he intervened and then he was beaten up and the N-word was referenced during the attack, we don't want these individuals using the N-word, why wouldn't that be sufficient? For a 1982 claim, when someone says, after that happened, and there's other things they describe, but that's obviously the key event, after that, we stopped using that portion of the property. Why isn't that depriving them of the use of that property because of this racial issue? Your Honor, with respect to that incident that you're referring to, even the plaintiff's own testimony is that Mr. Rose did nothing. He was a passenger in a Kubota utility vehicle. He did not use the N-word or any other racial epithets. He was a passenger in a vehicle that was threatening to run over children. That's the allegation, Your Honor. I mean, you said that there's no allegation, and now you're saying that that is the allegation. And someone reported him saying, I don't know if it was Mr. Hogan, but I think someone said he said, we can do anything we want, right? Wasn't there something in the record that he said that? I don't believe there was anything in the record that Mr. Rose said that. I believe he was just in the Kubota utility vehicle saying, leave us alone. We didn't do anything wrong. And I don't know that there was anything contradicting that. But Mr. Hogan himself testified that Mr. Rose did not actually do anything during that incident. He did not utter any racial epithets. And the plaintiffs did, in fact, continue using and enjoying their property. They purchased additional property after that incident. Mr. Okudinani's sister did not start going to the property to vacation with the Hogan's until after that incident had occurred. So the evidence demonstrates that the plaintiffs did continue using and enjoying their property as they had previously. But as to Mr. Rose, there are no allegations sufficient to support a claim under section 1982. Even accepting all of the plaintiff's allegations is true. Thank you. I see the red light is on. And so we have several other folks to hear from. Mr. Melvin's next.  May it please the court. Edward Melvin with Barclay-Damon on behalf of the Lewis County Defendants Appellees. And today I'd just like to confirm and clarify for the court that my clients, which are the Deputy Sheriffs Layman and Cronizer, Lewis County itself, and the DA Moser and ADA Petzold. That the only remaining claims against all those defendants are really the eighth and tenth causes of action asserted by the plaintiffs. And both of them are for abusive process. The eighth is the 1983 and the tenth is the common law. And the only plaintiff in that regard remaining is Plaintiff Hogan. And then finally that the plaintiffs have abandoned all other of their claims against the defendants. So, as to the abusive process claim, as stated by this district court and this court in Cook v. Sheldon and Miles v. the City of Hartford. The gist of abusive process is the improper use of process after it is issued. In Miles, the court determined that there was no abusive process because the police who had arrested the plaintiff were no longer involved in his case thereafter. And similarly, in our case, Deputy Sheriffs Layman and Cronizer arrested Plaintiff Hogan on May 29th, 2010 and no longer were involved with any aspect of his prosecution thereafter. So for that reason, the court was correct in dismissing the abusive process claim. Also, we can go a step further, that was the basis for the judge's determination. I'd like to take a look at the fact that what Mr. Hogan is claiming, that the defendants agreed with the neighbors to force him out of the county. And one of the bases for that is a statement that he attributes to DA Moser. And that she said to the undersheriff, who then spoke to the Sheriff Layman, Charles Hogan, if at all possible, the neighbors get a pass. So if you look at that, there's no improper purpose to gain a collateral objective. She's stating to arrest him. And in fact, at that point in time, there was a pending arrest. Two weeks earlier, he had stolen, and there's probable cause for this in the district court decision, stolen sawhorses and a steel cable, two weeks later, they were able to arrest him. So also, they're talking about the deputies, stating, if I were you, if the neighbors treated me like this, I would move out of town. There's no proof of improper purpose to gain a collateral objective. What about, I thought Ms. Hogan testified that Defendant Petzold stated that it was his goal to have them leave the county, so that he didn't need to deal with the problem anymore. Why wouldn't that demonstrate collateral objective? Right, if you look at what Mr. Petzold said, he was, Mr. Hogan's claiming that they were filing charges against him to get him to leave the county. Mr. Petzold is saying, because of you, I have all these complaints to deal with. I'm tired of dealing with all of these complaints, and I'd like the headache to go away. By the way, he never said that, but I have to accept it as true for purposes of the summary judgment motion. Turning quickly to the municipal liability aspect of the case. Okay, they originally, they pled failure to train. There's no proof of that. Now they're alleging the final policy maker, a theory for DA Moser. They failed to raise that in the complaint. They failed to raise it when I moved originally. They failed to raise it in their motion for consideration. So I request that that theory be precluded. Thank you very much. Mr. Gores. Thank you, Your Honor. Excuse me. Mark Gores, appearing for defendant Vandewater. I would like to address this, the timing. Ms. Bosman talked about, well, this all began when Mr. Okundiandi came to- What's the relationship between, in timing, between when these kids began visiting the property and when litigation began? It is, well, the West litigation occurred sometime after that, but the acts involved in the West litigation, which led to the punitive damages, that's what was occurring at that time, and that's demonstrated- You think at that time, what time? At that time. At about the same time. What year? What year? I'm sorry, the West action, I believe, was 2009, Judge, but I would defer to the record for that. I was not involved in that case. When did the Okundiandi children begin visiting? My understanding is that Mr. Okundiandi began coming to the property in or about 2006, 2007. So that's before. It's before that litigation, but it's not before Mr. Hogan began doing the acts that led to the West litigation and the punitive damages. The cynicism here of saying, well, it's got to be race- You're saying that a jury found $200,000 worth of punitive damages because somebody removed a chain? I don't- No. No, I'm not saying that at all, Judge. What I'm saying- What was the- It was much more than that. What was it? It was removing the plaque, as Ms. Bosman indicated. It was also, Mr. Hogan built a fence that effectively locked the West out of their water supply, their bathroom, their shower. They had access to it only through hatch doors. And Mr. Hogan, the evidence in the West trial is that he had constructed a fence and actually locked those Bilko doors because he said that they were on his property, effectively preventing them from using their property. That's my understanding of what led to the West action in the beginning. There were also allegations of, and I think were proven, that the West's chimney pipe, stove pipe, was torn off because it allegedly- When does any record in this case or that we can take judicial notice of, when did that happen relative to when the Okudinani children began to visit? The only thing I can refer you to in this record is the reference to Judge Merrill's decision and the language he used in the timing of the West's complaint and action in trial, which I believe is set forth in this record. I can't give you the exact page of that, Your Honor, as I stand here. I'm not asking for it. I'm just asking. If there's a direct reference by your client to race during the incident, why isn't that enough to, if it's believed, prove that whatever issues there were going on with respect to the property, whether or not the acts were, that that particular act was clearly racial animus? Why, the timing seems less important on that incident because there's an allegation that he said that during the incident. Timing is important. I would say two responses, Judge. The timing is important from this standpoint. What Judge Kahn had before him was the plaintiff's interrogatory responses in which they were asked, what did discriminatory acts did Mr. Vandewater commit that were racially motivated? They gave us 25, 15 of those occurred before, in time, before Mr. Okudinani was ever there. Even if those other ones may not be racial, this one, if it's proven that he said that, then it's clearly a racial incident, right? But the timing, again, is critical here because what they're saying is that there was animus here between the parties well before Mr. Okudinani was ever on the scene. And as far as that particular incident, Judge, if we accept it as true, Mr. Vandewater's denied it. But if we accept it as true for the sake of that motion, the next step is here. Judge Kahn didn't reach because he felt he didn't have to. But the next step is, where's the evidence that you were discriminated against, that you were unable to use your property? They give this vague, well, we were discriminated against and didn't have the enjoyment of our property. If you can't entertain your guests on your property and it's basically a recreational property, then it seems to me at least a presumptively fair statement that you can't enjoy your property. Except that there was no evidence by Mr. Hogan's own testimony in the depositions and ultimately trial because it's dead. And his family didn't come the following year precisely because of that incident. They did not come, right? Didn't he say that? Well, Mr. Hogan may have said that, I don't know. But if he did, I'm not sure that he would have been qualified to testify as to what Mr. Okudinani's rationale was. So I apologize, I wouldn't think that would be taken or given any weight. All right, thank you very much. I think we have the arguments. Mr. Van Beveren. Good morning, your honors. May it please the court. My name is Matthew Van Beveren from the law firm of Gail, Gail, and Hunt. I represent Kathy Wilson and Russell Falter. Briefly, your honors, we've gone through this already this morning on the 1982 claims with respect to Falter and Wilson. There simply is nothing there. And I believe in some of the language in one of the decisions, the court emphasized that the allegations in this regard really don't apply to Falter and Wilson. They were not involved in the Kubota incident. Well, they have two incidences regarding your clients. One is that they repeatedly swerved the vehicle on an incident, I don't know which summer it was, saying who do you have in there when they had Denny in the car? That was one. And then there's this discussion with the park ranger, right? Well, the park ranger thing, I don't know what to make of that, your honor. There's no racial animus on its face from that statement. I mean, it's a hearsay statement that on its own is meaningless. Whether it's hearsay or not is a different issue. That's not a racial statement? We don't want our lake polluted and referencing when the children are swimming in the lake? Well, we don't know what that's referencing at all. I mean, with Mr. Hogan's conduct throughout the years of what he's done up with his property, there's no racial animus on its face. To construe that statement most favorably to the plaintiff, right? We have to construe that most favorably. I think even if you construe that most favorably, there's no racial animus. I would not take that as racial animus. And with respect to the swerving, there's general allegations that there was swerving by all parties. And it's noted that this is, we're talking about a one lane gravel road, right? It services camps and some permanent houses throughout there. Throughout that whole time, there's people, in most cases, there's only one lane for a car to get through. There's no way to know. There's no way to, even with that allegation, it's not the swerving in and of itself. It's the swerving combined with an alleged statement, who you got in there, referencing the children who were in the car. The African American children, I mean, when I say referencing, they didn't reference them, but that's the inference. And again, that's not, there are other inferences that could be drawn potentially, but that's not a reasonable inference that you're referring to the children? I don't believe so, Your Honor, I don't. There's no indication that any of those, even talking about the time frame of when this young man was up at the camp is one week out of the year. There's allegations of swerving and cars coming into almost contact with each other throughout all these years. I don't think, again, on its face, there's any whiff of racial animus from Falter or Wilson. Moving quickly to the IAED claim, I don't believe the appeal touches on Falter and Wilson's dismissal, because the court in the March 2013 decision does not talk about medical proof, talked about the level of conduct and the outrageousness of it. And that- It does seem that the fourth department is more relaxed about what kind of proof would support an IAED claim, right? Well, I think they are with respect maybe, perhaps, to the medical aspect, but not the conduct. And at least with respect to Falter and Wilson, the court held specifically that the conduct itself did not rise. Even taking all of the allegations as true, which was required to do, the swerving, the yelling, there's a very high standard in New York State for IAED claims to go forward. And irrespective of, they didn't put any medical proof in, which the fourth department, they sort of tie that to conduct, but they do say special circumstances, but that's separate for Falter and Wilson. There was medical proof, though. They pointed out in their papers that a doctor said that they were exhibiting symptoms of depression and anxiety, right? There were medical records that said that, right? I believe they did treat with a psychotherapist at one occasion. But again, with respect to Falter and Wilson, the dismissal was based on the conduct alone. They didn't have to reach the medical issue itself. It's based just simply on the conduct and the egregiousness. Thank you, Your Honors. Thank you very much. Ms. Bossman, you have three minutes to rebuttal. Thank you, Your Honor. Falter and Wilson blocked access to the property and used racial epithets against Denny Akudinani while he was visiting. And they used- When was that? Pardon? When was that? That's that special appendix. No, what's the date? 46. I don't have the date, but I would like to offer Your Honor this. I will submit a chronological outline for Your Honor that is set forth in the record to clarify those dates for you. We have the record. Okay. You can refer back to it. Thank you. I'd like to draw the court's attention to Walker v. Pointer, 304 Fed Sup 56, a 1969 case from the Northern District of Texas. Plaintiffs suffered harm because they made the property under their lease available to black social guests. It was alleged that the defendants evicted them in retaliation for the appearance of Negro guests on the Walker premises in order to prevent a recurrence of such visits in the future. They relied on the Jones case. They said that Negro invitees, along with other social and business guests, would be able to enjoy an implied easement of ingress and egress. Are there any other litigations pending between and among these parties? Yes, yes, I believe that there is, yes. You believe or you know? Well, I know that there is a motion for summary judgment pending, and I don't believe that that is. In another, I said, are there any other litigations between and among these parties? Correct, because of the false arrests. So he had 15 charges, charging him with a trespass, which now they're saying. Argue it, I'm just asking. I'm sorry. I'm just saying. Yes, yes. This is a series of litigations. Well, I don't think that it's a series of litigation. I think that Mr. Hogan, in the litigation in terms of the malicious prosecution and the false arrest, is standing his ground, Your Honor, which he has a right under the law to do. There's another lawsuit, where is it pending? Northern District of New York. Northern District of New York, that's correct. And when Judge Rothstein observed during her comments that the litigation would continue, part of the reason for that is that the survey that was accepted at trial by Judge Rothstein moved the back boundary line back 96 feet, so that the allegations that he was trespassing on Vanderwater's land couldn't exist at the time, because he couldn't have been on Vanderwater's land if he was on Rose's land, because now they're saying, well, the back lot line was set back another, I think, 96 feet. He couldn't be on Vanderwater's land if he was trespassing on Rose's land. Correct. Couldn't be trespassing on Vanderwater's land if he was on Rose's land. And the charges that were brought against him and were dismissed ultimately on the speedy trial motion that I made repeatedly, alleged that he was trespassing on Vanderwater's land. But what happened is, after the summary judgment. Thank you. Thank you. Your time has expired. Thank you, Your Honor. The arguments will take the matter under advisement.